# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## CHIEF JUDGE MARCIA S. KRIEGER

Criminal Action No. 18-cr-00105-MSK-GPG

**UNITED STATES OF AMERICA,**

   Plaintiff,

v.

**JULIA CANTERO,**

   Defendant.

_____

## OPINION AND ORDER OVERRULING OBJECTIONS
## AND DENYING MOTION TO SUPPRESS
_____

**THIS MATTER** comes before the Court pursuant to Ms. Cantero's Objections **(# 49)** to the Magistrate Judge's October 2, 2018 Recommendation **(# 41)** that Ms. Cantero's Motion to Suppress **(# 26)** be denied, and the Government's response **(# 50)**.

## FACTS

Ms. Cantero is the subject of a two-count Indictment **(# 1)** filed February 27, 2018, charging her with possession of heroin and methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a) and (b)(1)(A). She was apprehended at 1:41 p.m. on September 29, 2017 on I-70 eastbound near Loma, Colorado, pursuant to a traffic stop initiated by Deputy Miller of the Grand Junction Police Department. Deputy Miller initially stopped Ms. Cantero for failing to remain in her lane. During the stop, Deputy Miller summoned Trooper Gosnell of the Colorado State Patrol, who arrived at the scene with a canine unit and conducted a search of the

vehicle. After the canine unit alerted while making a pass around Ms. Cantero's vehicle, the officers physically searched the vehicle's trunk, and located the drugs in question.

Ms. Cantero moved **(# 26)** to suppress the fruits of the search, arguing that: (i) Deputy Miller lacked reasonable suspicion to stop Ms. Cantero for a traffic violation, as Deputy Miller's report states only that Ms. Cantero drove <u>on</u> the fog line (the solid white line of the right side of the rightmost travel lane), not over it, and that driving on the fog line does not constitute a violation of C.R.S. § 42-4-1007; and that (ii) Deputy Miller prolonged the stop beyond the time necessary to issue a traffic citation, without reasonable suspicion, for the purpose of allowing Trooper Gosnell and the canine unit to arrive and perform a search.

The Court referred Ms. Cantero's motion to the Magistrate Judge for a recommendation, and on October 2, 2018, the Magistrate Judge held an evidentiary hearing at which both Deputy Miller and Trooper Gosnell testified. At the conclusion of that hearing, the Magistrate Judge recommended that Ms. Cantero's motion be denied. Ms. Cantero filed timely Objections **(# 49)** to the recommendation, as discussed below.

## ANALYSIS

### A. Standard of review

The Magistrate Judge's Recommendation was issued pursuant to 28 U.S.C. §636(b)(1)(B). Under that statute, this Court makes a "*de novo* determination of those portions of the . . . recommendations to which objection is made." Notably, the requirement is that this Court conduct a *de novo* <u>determination</u>, not necessarily a *de novo* <u>hearing</u>. The Court is possessed of wide discretion to accept, reject, or modify the Magistrate Judge's proposed findings, including resolving issues of credibility. *U.S. v. Raddatz,* 447 U.S. 667, 676 (1980).

### B. Initial stop

A traffic stop is a seizure under the Fourth Amendment, and thus the officer initiating it must have reasonable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *U.S. v. Salas*, 756 F.3d 1196, 1200-01 (10th Cir. 2014). Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances and the officer's subjective motivation for the stop is irrelevant. *Id.* at 1201. The Government bears the burden of proving the reasonableness of the officer's suspicion at all pertinent stages of the encounter. *U.S. v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).

Deputy Miller testified that, while driving eastbound on a straight stretch of I-70, in weather conditions involving no more than a "slight breeze," he approached a silver Nissan Ultima in the right-hand lane. He observed that "the driver . . . was actually traveling on the white fog line, or shoulder line, out – about in the middle of the tire. . . right down the center of the line. So the outside portion of the tire would have been over the line, but the majority of the tire was . . . right in the middle of the fog line." On cross-examination, Deputy Miller clarified that "half of the tire was on the fog line. The fog line is 3 or 4 inches wide. If the center of that tire is on the fog line, . . . the outside tire's edge of that is going to be over the fog line." Deputy Miller observed the vehicle travel in that manner for "at least a quarter of a mile" or approximately 12 seconds. As Deputy Miller approached the vehicle, it "made an abrupt swerve or crunching back into the center" of the lane. Believing that the driver might be fatigued, distracted, or possibly intoxicated, Deputy Miller decided to pull the driver over for "the traffic violation of – the lane violation or weaving."

C.R.S. § 42-4-1007(1)(a) provides that "a vehicle shall be driven as nearly as practicable entirely within a single lane. . . ." Ms. Cantero argues that the Court should interpret that statute consistent with the 10th Circuit's opinion in *U.S. v. Gregory*, 79 F.3d 973 (10th Cir. 1996). There, a police officer pulled over a driver of a U-haul truck after observing the truck "cross two feet into the right shoulder emergency lane of the interstate" on a single occasion. Eventually, a search of the truck revealed the presence of illegal drugs, and the driver was charged with possession. Reversing the trial court's denial of a motion to suppress the fruits of the stop, the 10th Circuit explained that "we do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of [a state statute effectively identical to C.R.S. § 42-4-1007(1)(a)]." It noted that, in the circumstances presented:

> the road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane. Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision. These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway . . . could not constitute a violation of [traffic] law.

79 F.3d at 978.

Since *Gregory*, the 10th Circuit has been careful to distinguish and limit that ruling to its particular facts – *e.g.* a winding road and significant wind. *See U.S. v. Langel*, 269 Fed.Appx. 787, 791 (10th Cir. 2008) (collecting cases). For example, in *U.S. v. Ozbirn*, 189 F.3d 1194 (10th Cir. 1999), the 10th Circuit affirmed the denial of a motion to suppress a traffic stop where the police officer observed a motor home "drift onto the shoulder twice in less than a quarter of a mile." The court initially conceded that "when an officer merely observes someone drive a

vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation." But it found that, "[u]nlike the factual scenario in *Gregory*, . . . the present case involves no such adverse physical conditions," as the "weather was sunny and not unusually windy, and the road was smooth and dry with only a gentle curve and slight uphill grade." The court also distinguished *Gregory* insofar as "the defendant in *Gregory* drifted across the lane only once, while Ozbirn drove onto the shoulder twice within a quarter mile." Thus, the 10th Circuit held that the traffic stop in *Ozbirn* was appropriate. 189 F.3d at 1198.

Similarly, in *U.S. v. Alvarado*, 430 F.3d 1305 (10th Cir. 2005), the officer observed the defendant's Jeep "cross about a foot over the right fog line of the highway, continue traveling over the line for a few seconds, and then cross back to the right hand lane." Affirming the denial of the defendant's suppression motion, the 10th Circuit emphasized that *Gregory* "does not stand for the proposition that a single instance of drifting onto the shoulder can <u>never</u> be a violation of a traffic statute." (Emphasis in original.) It noted that, unlike *Gregory*, "there were no adverse weather or road conditions" that might have excused the defendant's failure to stay in his lane. It also rejected the defendant's invitation to "hold that an officer must observe something more than a single lane crossing in order to reasonably suspect a violation" of traffic laws; instead, the court explained that, rather than bright-line rules, the appropriate analysis requires "a fact-specific inquiry into the particular circumstances present during the incident in question to determine whether the driver could reasonably be expected to maintain a straight course at that time in the vehicle on that roadway." 430 F.3d at 1308-09.

Here, Ms. Cantero concedes that she "didn't encounter road or weather conditions" like those in *Gregory*. Instead, she argues that because she only crossed over the fog line by a few inches for a few seconds, Deputy Miller lacked reasonable suspicion to believe that she violated

5

C.R.S. § 42-4-1007(a)(1). Ms. Cantero does not cite to, and this Court is not aware of, any authority interpreting C.R.S. § 42-4-1007(a)(1) that determines whether the statute is violated based specifically on the amount of vehicle that passes out of the lane or the amount of time the vehicle does so. In the absence of such authority, the Court is inclined to construe the statute literally: the vehicle must remain "entirely within" a single lane. Thus, even if only an inch of Ms. Cantero's tire drifted across the fog line, it would appear that she no longer had the entirety of her vehicle in the travel lane and thus, she violated the statute.

Although this Court is in agreement with many of the reservations articulated by the 10th Circuit in prior cases – that a single, brief instance of a driver crossing slightly over the fog line will not necessarily amount to reasonable suspicion permitting a traffic stop – cases like *Alvarado* indicate that a single instance of a driver crossing over the fog line a short distance (there, one foot; here, a few inches), for a brief period of time (there, a "few seconds"; here, a period of 12 seconds) nevertheless suffices to permit a traffic stop where no other environmental conditions justified the driver departing from the travel lane. As the Magistrate Judge noted in his ruling, Ms. Cantero was driving "a standard-sized passenger vehicle in a standard lane of interstate travel," and no other apparent circumstances explain her inability to keep the entirety of the vehicle within the travel lane. Accordingly, this Court agrees with the Magistrate Judge that Deputy Miller had reasonable suspicion to believe that Ms. Cantero was violating C.R.S. § 42-4-1007(1)(a), sufficient to justify the initial stop.

**C. Length of the stop**

Once a traffic stop is made, its duration must be limited to the scope and circumstances that initially justified it. *U.S. v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). However, if, in the course of the stop, the officer acquires a particularized and objective basis for suspecting that the

6

person stopped is engaged in other criminal activity, the officer may extend the stop to investigate further. *U.S. v. Kitchell*, 653 F.3d 1206, 1217-18 (10th Cir. 2011).

Once Deputy Miller activated his emergency lights to pull over Ms. Cantero, he followed her for approximately half a mile before she came to a stop. During that time, he was driving with his window down and noticed a "perfume-type odor" associated with car air fresheners. He assumed the scent came from Ms. Cantero's car. Deputy Miller explained that some drivers have been known to spray air fresheners in their vehicle before a traffic stop as "as a masking agent . . . to make it more difficult for law enforcement to smell illegal narcotics."

Before approaching Ms. Cantero's car, Deputy Miller requested information about the vehicle from the National Crime Information Center ("NCIC") database. He learned that the vehicle had been registered to Ms. Cantero in May of that year, approximately 5 months earlier, and that it had approximately 100,000 miles on the odometer at that time.

Deputy Miller then approached Ms. Cantero's car and noticed "a very strong perfume-type odor," one that "would be uncomfortable for me to want to be around her or be in that vehicle for a very long time." He subsequently observed that Ms. Cantero had at least five tree-shaped air fresheners in the car – two hanging from the steering column, two more (possibly unopened) on the center console, and a fifth on the floor. Deputy Miller considered the number of air fresheners to be atypical.

He explained why he stopped her, and Ms. Cantero responded that she might be fatigued, given that she had departed her home in California at 2:00 a.m. that day (and thus had presumably been driving for almost 12 full hours). Deputy Miller considered that departure time to be atypical for ordinary drivers, but that it was common for persons engaged in criminal activity to attempt to travel under cover of darkness whenever possible. Deputy Miller noted the

odometer of the vehicle now read 119,000 miles,[1] indicating that Ms. Cantero had driven roughly 19,000 miles in the span of 5 months, a distance that significantly exceeded the roughly 13,000 miles that an average driver accumulates in an entire year. Deputy Miller testified that such high mileage is often indicative of persons engaged in drug trafficking. Deputy Miller asked what her travel plans were, and Ms. Cantero stated that she was driving to Aurora, Colorado to visit her cousin for a two-day period. Deputy Miller considered that explanation unusual, given the length of the trip and comparably short turn-around time.

Ms. Cantero then informed Deputy Miller that he had stopped her before, apparently in June, for not having a front license plate. Deputy Miller testified that he then recalled the June stop, remembering that Ms. Cantero had stated during that stop that she was returning from a two-day visit with her cousin. He further recalled that, during that stop, Ms. Cantero had given him permission to search the car and that that search had revealed some receipts from Minneapolis, Minnesota dated a few days earlier. Ms. Cantero had denied having been in Minnesota, and was unable to explain the receipts. Deputy Miller recalled that both his canine unit and one used by Colorado State Trooper Shane Gosnell were used during that stop, and that both dogs alerted to the odor of narcotics near the trunk of the car, but physical searches revealed no drugs. Deputy Miller remembers remarking to Ms. Cantero that she was "lucky . . . I didn't get you going eastbound" and that she should consider "a new line of work." Deputy Miller explained the "eastbound" remark by noting that, in general, drug traffickers in Colorado carry narcotics from sources in the southwest to destinations in the midwest or east coast, and return westbound with either the proceeds of the transaction or nothing at all. Thus, Deputy Miller was

---

[1] Ms. Cantero seems to argue that Deputy Miller could not have read her odometer from his vantage point on the passenger side of the car, but Deputy Miller insisted that he could and no evidence points to the contrary.

8

essentially advising Ms. Cantero at that June stop that he believed she was engaged in the business of drug trafficking.

At this point in the September stop, Deputy Miller stepped away from Ms. Cantero's car and called for Trooper Gosnell to report to the scene with his canine unit. The Court pauses its analysis at this point because Deputy Miller's decision to summon Trooper Gosnell is an action unrelated to the stated purpose of Deputy Miller's stop: to potentially cite Ms. Cantero for weaving in violation of C.R.S. § 42-4-1007. A valid traffic stop entitled Deputy Miller to request Ms. Cantero's license and registration, to run a computer check, and to issue a citation; detaining her any longer than necessary to complete that process would require Deputy Miller to have further reasonable suspicion of additional illegal activity beyond the traffic violation. *U.S. v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Deputy Miller did not testify that his decision to summon Trooper Gosnell was in any way related to the alleged C.R.S. § 42-4-1007 violation.[2] Deputy Miller acknowledged that although he had Ms. Cantero's license and registration in-hand, he had not begun the process of checking them when he decided to stop and call Trooper Gosnell. Thus, it cannot be said that the calling of Trooper Gosnell occurred during a temporal lacuna where Deputy Miller was otherwise idly standing by and waiting for a license

---

[2] Deputy Miller seemed to initially testify on cross-examination that he summoned Trooper Gosnell "for safety" purposes and because he "felt [he] needed a cover car." It does not appear that the Magistrate Judge relied on that testimony as a basis for extending the stop, and this Court does not do so either. Deputy Miller did not testify to any facts that would suggest that he had a reasonable suspicion that Ms. Cantero had the intention, or even the ability, to harm him.
    Deputy Miller also seemed to acknowledge that, by that point, he had abandoned any intention of citing Ms. Cantero for the traffic violation. In response to the question of why he had begun to check her license yet, Deputy Miller testified that "I wasn't going with the traffic stop and talking to her about the violation." Deputy Miller was also asked "so as soon as she told you you had stopped her before, you knew it was time to get the dog; isn't that right?," to which Deputy Miller replied "Absolutely." The Court finds that explanation far more credible, and conducts its analysis accordingly.

check to complete.   Although Deputy Miller may have needed only a few seconds to complete the task of calling Trooper Gosnell, even a brief extension of a detention, if not supported by sufficient cause, can violate the Fourth Amendment.  *U.S. v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013).  Thus, the Court stops here to determine whether Deputy Miller had a reasonable suspicion that Ms. Cantero was engaged in drug trafficking, sufficient to extend the traffic stop further.

The Court examines whether the facts recited above provided sufficiently objective evidence to justify a reasonable suspicion that Ms. Cantero was in possession of illegal drugs. Many of the factors Deputy Miller cited have been found to support a reasonable suspicion of drug trafficking activity.  For example, the 10th Circuit "has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis."  *U.S. v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000).  The vehicle had significantly greater mileage on it than average, a fact that has been recognized to be consistent with a connection with drug trafficking. *See e.g. U.S. Berrelleza*, 90 Fed.Appx. 361, 364 (10th Cir. 2004).  The Magistrate Judge found that "there was some significant inconsistencies in [Ms. Cantero's] travel plans," and such inconsistencies or implausibilities may support reasonable suspicion.  *See e.g. U.S. v. Pettit*, 785 F.3d 1374, 1381-82 (10th Cir. 2015). Admittedly, Ms. Cantero's stated travel plans -- a late-night departure and roughly 15-hour driving trip to visit a cousin in Colorado for two days – might not be inherently implausible in and of themselves.  But those plans become more suspicious in light of Deputy Miller's recollection of Ms. Cantero offering that same justification during the traffic stop in June, yet evidence of her having recently been in Minnesota suggested that those claimed plans were untruthful.  This Court sees no reason why Deputy Miller could not rely on facts that he recalled from his prior encounter with Ms. Cantero and correlate them with her claim to be

repeating that same trip again in September. More significantly, however, Deputy Miller also recalled having previously concluded that Ms. Cantero was previously dishonest about her travel plans and that she was very likely a drug trafficker.

Ms. Cantero's Objections focus significantly on alleged discrepancies between Deputy Miller's testimony and that of Trooper Gosnell, and she contends that the Magistrate Judge erred by not making credibility findings that would resolve those discrepancies. For example, she contends that "Trooper Gosnell did not smell air freshener, even though he was in and around Ms. Cantero's car during the stop." However, the cited portion of the transcript does not present a clear dispute between Trooper Gosnell and Deputy Miller on this issue. Making the point that Trooper Gosnell was not present at the start of Deputy Miller's involvement with Ms. Cantero, Ms. Cantero asked Trooper Gosnell:

> Q: Now, you weren't there when Investigator Miller was trying to stop Ms. Cantero, right?
>
> A: No.
>
> Q: You didn't smell the odor of perfume coming from—or coming in through Investigator Miller's window?
>
> A: No.
>
> Q: If you were in a situation like that where you, all of a sudden, smelled perfume, would that raise a red flag for you?
>
> A: I have smelled air freshener or a cover odor extremely strong prior to traffic stop and during. And it has, based on the totality of circumstances, been suspicious to me because I know that those odors are used to cover – or try to cover the odor of narcotics from both our observation and police canines.

(Emphasis added.) Thus, Trooper Gosnell was not directly asked whether he ever detected any odors from Ms. Cantero's vehicle. Rather, whether he smelled the odor "coming in through Investigator Miller's window." Needless to say that, because Trooper Gosnell was in his own

11

vehicle somewhere else when Deputy Miller was smelling the odor through his open window while attempting to pull Ms. Cantero over, the question posed to Trooper Gosnell and his answer does not create any dispute as to whether Deputy Miller smelled the odor at any point in time. Likewise, the next question posed to him was whether such an odor would "raise a red flag for him," not whether he smelled any such odor in Ms. Cantero's vehicle. This, too, does not create any doubt as to the credibility of Deputy Miller's testimony, because, once again, Trooper Gosnell was not asked whether he detected the same odor, whether in character or degree, that Deputy Miller reported detected. There being no discrepancy in the two officers' testimonies, there was no credibility finding by the Magistrate Judge that needed to have been made. By all appearances, the Magistrate Judge credited Deputy Miller's testimony about detecting an odor from Ms. Cantero's vehicle, and nothing in the record suggests to this Court that the Magistrate Judge erred by doing so.

Similarly, Ms. Cantero argues that there is a discrepancy between Deputy Miller's testimony that he recalled Ms. Cantero's story about her travel plans from the June stop and an audio recording made by Trooper Gosnell during the September stop when the two officers were on scene together. That recording, identified as Exhibit F3, has somewhat unclear audio, but the Court's best interpretation of it is as follows:

> Trooper Gosnell: Yeah, last time [inaudible] she had [inaudible] back [inaudible] something kids to school or...?
>
> Deputy Miller: Her story was terrible. I don't even remember what it was.
>
> Trooper Gosnell: I don't remember either.

Thus, Ms. Cantero argues that Deputy Miller's testimony that, in September, he remembered her alleged travel plans discussed during the June stop is inconsistent with his statement to Trooper

Gosnell in September that he couldn't remember what Ms. Cantero had said her plans were during the June stop.

There is no actual discrepancy in the record between Deputy Miller's testimony and the recording. When asked on cross-examination about whether he recalled the story that Ms. Cantero had told him during the June stop, Deputy Miller's acknowledged that "I don't remember all of it, no." This is consistent with Deputy Miller's statement on the recording that "I don't even remember what [the June story] was." However, Deputy Miller testified during the suppression hearing that he <u>did</u> recall the outcome of the June stop – that a canine search produced a positive alert but a physical search revealed no drugs, leaving Deputy Miller convinced that Ms. Cantero had transported drugs. This, too, is consistent with Deputy Miller's recorded statement that he remembered only that Ms. Cantero's "story was terrible." Thus, the Court sees no discrepancy in Deputy Miller's testimony that requires a detailed credibility finding.

The 10th Circuit has found that a police officer may rely on a prior lawful-yet-unsuccessful search as a component of a reasonable suspicion to search the defendant on a later occasion. In *U.S. v Padilla-Esparza*, 789 F.3d 993, 999 (10th Cir. 2015), the defendant was stopped and searched by a canine unit in February 2013. The dog alerted and a search revealed a non-standard compartment in the defendant's vehicle, but the compartment was empty. Officers noted their suspicions about the defendant in a database, but released him. Another officer encountered the defendant a second time in September 2013. The officer again found certain statements the defendant made – about his profession, his travel plans, and certain receipts in his possession – to be suspicious, but a physical search of the defendant revealed no contraband. Thus, he was again released, but the officer's suspicions about him were again recorded in a

13

database. Several days later, upon learning that the defendant had again entered the United States, the police officer who conducted the second search, relying upon the two prior encounters with the defendant, issued a "BOLO" – "be on the lookout" -- advisement to other officers that, if they encountered the defendant, they should "detail [him] and conduct [an] intensive exam." The defendant was apprehended by other police officers based on the BOLO and, when searched, was found to be in possession of drugs. In affirming the trial court's denial of the defendant's motion to suppress, the 10th Circuit specifically considered whether the police officer's issuance of the BOLO was supported by reasonable suspicion. Finding that the BOLO was supported by the first stop (a canine alert yielding no actual contraband) and the second stop (in which the defendant made certain doubtful statements but had no contraband), the 10th Circuit concluded that the BOLO, and thus the third stop it produced, was permissible. *Id.* at 999-1000.

*Padilla-Esparza*'s facts can be condensed to closely match the instant case. Like the defendant there, Ms. Cantero was the subject of a prior search in which a canine unit detected the presence of narcotics, but no narcotics were actually found. During that same stop, Ms. Cantero also made statements to Deputy Miller that raised his suspicions about her honesty, even if he could not necessarily recall the precise details of those seemingly-false statements in September. Because these factors were sufficient to give rise to reasonable suspicion to issue an order to preemptively stop and detain the defendant in *Padilla-Esparza*, the same result arises here. The conclusions Deputy Miller reached as a result of the June stop constitute valid components of the reasonable suspicion analysis for purposes of the September stop, regardless of whether Deputy Miller could specifically recall the particular details from the June stop at that time.

Accordingly, the Court finds that these factors, taken in combination, provided reasonable suspicion for Deputy Miller to extend the stop by calling in Trooper Gosnell to assist.

### D. Trooper Gosnell and the final search

After calling Trooper Gosnell, Deputy Miller then asked Ms. Cantero to step out of her car. He explained that he did so in order to "gauge [her] behavior [ ] better," and also because she had acknowledged being fatigued and Deputy Miller believed that "with people that are falling asleep, get[ting] them out of the car, get[ting] some fresh air" often leads to drivers being thankful for the opportunity. Once Ms. Cantero had gotten out of the car, Deputy Miller mentioned that noticed she had different license plates on her car than she had had during the stop in June. Ms. Cantero responded that "she couldn't find her front license plate" after the June stop, "so she went to the DMV and got two more plates." Deputy Miller considered that response suspicious, insofar as in his experience, "People involved in trafficking, once they've been stopped. . . they are likely to change license plates. . . They get paranoid, they don't know if they are being watched [or] surveilled."

At or about this time, Deputy Miller asked his dispatcher to check on Ms. Cantero's driver's license. Trooper Gosnell arrived around the same time, and Deputy Miller noted that Ms. Cantero's demeanor changed, becoming more anxious. Deputy Miller then "signaled for Trooper Gosnell to run his dog around the car," and the dog gave a positive alert near the trunk of Ms. Cantero's vehicle. It was about this point in time that the dispatcher called back with the results of the driver's license check. The record does not reflect those results because, by this point in time, the officers, relying upon the dog's alert, asked Ms. Cantero to open the trunk, at which point the dog alerted to a duffle bag containing several pounds of narcotics.

Extended discussion of this phase of the encounter is largely unnecessary in light of the preceding analysis: the same reasonable suspicion that justified Deputy Miller calling Trooper Gosnell in the first place would also support the two officers ordering Ms. Cantero out of her

vehicle and conducting a canine search. And Ms. Cantero does not dispute that, once the dog alerted at the vehicle, a search of the trunk was justified.

Accordingly, the Court finds that the police had reasonable suspicion to detain Ms. Cantero in the first instance and to extend that detention until the point that the drugs in her possession were discovered.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Ms. Cantero's Objections **(# 49)**, **ADOPTS** the Magistrate Judge's recommendation **(# 41)**, and **DENIES** Ms. Cantero's Motion to Suppress **(# 26)**. The parties shall jointly contact Magistrate Judge Gallagher's chambers immediately to determine the next appropriate setting in light of the Speedy Trial Act.

Dated this 14th day of January, 2019.

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
Chief United States District Judge